## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**ALICE MICHELLE MERENA**,

        Debtor.

Case No.  **08-60066-7**

**KENNETH MERENA** and **YU ZHAO**,

        Plaintiffs.

-vs-

**ALICE MICHELLE MERENA**,

        Defendant.

Adv No.  **08-00046**

## *MEMORANDUM of DECISION*

At Butte in said District this 10th day of March, 2009.

In this Adversary Proceeding, Plaintiffs Kenneth Merena ("Merena") and Yu Zhao ("Zhao") seek the denial of the Defendant/Debtor Alice Michelle Merena's ("Alice") discharge under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(6), 727(a)(3), 727(a)(4) and 727(a)(6)(C). Alice opposes the Plaintiffs' allegations. After trial of this cause and review of applicable law, this matter is ready for decision. For the reasons set forth below, a separate judgment shall be entered in favor of Alice and against the Plaintiffs, dismissing all Counts of the Plaintiffs' Complaint with prejudice.

1

The agreed Final Pretrial Order submitted by the parties on December 9, 2008, was approved by the Court, with legal clarification, on December 11, 2008.  It provides that this Court has jurisdiction of this cause under 28 U.S.C. § 1334, and that this is a core proceeding under 28 U.S.C. § 157.   This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

Trial of this Adversary Proceeding was held at Billings on December 16, 2008, and at Butte on February 10, 2009.  The Plaintiffs Merena and Zhao appeared and testified, represented by attorney Craig D. Martinson of Billings, Montana.  Alice appeared and testified, represented by attorney Toby Alback of Billings, Montana.  The only other witness that testified at trial was the Chapter 7 Trustee, Joseph V. Womack of Billings, Montana.  The Plaintiffs' Exhibits 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 17, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29 and 30 were admitted into evidence without objection as were Alice's Exhibits A, F, G, H, I, J, K, L and M.  The Plaintiffs' Exhibits 8, 15 and 16 were admitted into evidence over Alice's objection.

As previously noted, trial in this matter commenced on December 16, 2008, and at that time, the Court allowed Merena to appear for the trial via video from Utah for the convenience of Merena and because of an outstanding arrest warrant against Merena in Montana.  Merena stated at the trial on December 16, 2008, that he had made his own arrangements for a video conference site and also stated early on that "knowing the intense depth of evidence," he anticipated that the trial in this matter could not be concluded in a single day.  On December 16, 2008, the Plaintiffs concluded  their case-in-chief.  However, when it became apparent that the trial was indeed not going to conclude on December 16, 2008, since Defendant wished to

2

proceed with her case-in-chief, the Court stated that it would reconvene the trial on December 17, 2008, at 09:00 a.m.  Merena then informed the Court that he could not secure his video connection for December 17, 2008, and further indicated that he would not be available to attend any continued trial until after Christmas.  Merena argued that it was imperative that he attend the entire trial in this case.  Because the Court was not able to find another trial date that was conducive to both the Court's and Merena's schedule, in an Order entered December 17, 2008, the Court set a scheduling conference for January 14, 2009, to determine when trial in this matter would conclude.

Following the scheduling conference held January 14, 2009, the Court entered an Order setting February 10, 2009, as the date for the continuation of the trial. The Court specifically picked February 10th in order to allow Merena to appear from Butte and avoid any future video conference issues.  The Court directed Alice to appear from Billings on February 10th because the Court did not want to cause any restraining order violation by Merena.

Given Merena's apparent desire to financially strangle Alice through legal proceedings, the Court was not surprised when Merena filed a request for continuance of the trial on February 4, 2009, stating that he had some other conflict on February 10, 2009.  Merena did not disclose the nature of the conflict and did not disclose why he waited three weeks to notify the Court of his conflict.  Consequently, the Court denied Merena's request for continuance. Despite the alleged conflict, both Merena and Zhao were at the reconvened trial on February 10, 2009.

## AGREED FACTS

The approved Final Pretrial Order sets forth the following agreed facts:

3

    1.  Merena and Yu are creditors in the above entitled bankruptcy case.

    2.  This action is being brought in connection with the bankruptcy case of Alice Merena, initially filed as a Chapter 13 case and then converted to a Chapter 7 proceeding.

    3.  Kenneth and Yu reside in Salt Lake County, State of Utah.

    4.  Merena and Alice are husband and wife with separate places of residence.

### ADDITIONAL FACTS

Additional facts are taken from the testimony and exhibits admitted at trial, and the case dockets of this Adversary Proceeding and Alice's main bankruptcy case.  Prior to meeting Merena, Alice had two children from a prior marriage to Ryan S. Graveley.  The evidence suggests that Merena and Alice met sometime in 2005, while Alice was finishing college, and were living together by the beginning of 2006.  Merena and Alice were married in Utah on June 11, 2006.  Alice subsequently filed for divorce from Merena on August 21, 2007.  Exhibit 16.

The testimony and exhibits show that Merena's and Alice's relationship was tumultuous. For example, Alice testified that she got in a fight with Merena while on a family vacation to Montana during the summer of 2007 and Merena ended up returning to Utah alone, leaving Alice and her children stranded in Montana.  Merena and Alice also had a dispute in January of 2006 that resulted in Alice being charged on January 13, 2006, with domestic violence in the presence of a child and criminal mischief .  Exhibit 15.  However, Exhibit 15 also shows that the aforesaid domestic violence charge was dismissed not long thereafter on January 24, 2006. Alice pled guilty to the criminal mischief charge and after completing an anger management class, the criminal mischief charge was dismissed on January 2, 2007.  Finally, Exhibit 17

4

shows that Alice filed a Request for Protective Order against Merena on August 1, 2007.  Alice asserts on page 3 of the Request for Protective Order that "she is ending the relationship [with Merena] and seeking a Divorce and fears [Merena's] reaction."  Exhibit 17.

Zhao is a self-employed computer analyst who first met Merena when Merena needed computer service at his dance club.  Zhao and Merena are now close friends who see each other often.  Zhao and Merena are also business partners who own a partnership or other similar business entity that owned and still owns the home at 14135 Senior Band Road, Draper, Utah in which Merena and Alice lived with their respective children.  Merena, who also goes by Dr. Merena, owns a dance club and is engaged in real estate investment and other consulting activities.

Zhao met Alice when she first began dating Merena.  Zhao attended Alice's and Merena's wedding and considers himself Alice's friend.

Zhao testified that Alice called him during the late afternoon of August 20, 2007, claiming she needed financial assistance.  Zhao testified that he agreed to meet with Alice on August 20th "as a friend" to "find out what was happening."  Zhao remembered the exact date of the meeting because he had accompanied Merena to a hearing on Alice's Request for Protective Order earlier that same date.  Merena testified that Zhao's telephone numbers are 801-375-3100 and 801-358-9099. Alice's telephone records at Exhibit 30 reflect that Alice called Zhao at 5:25 p.m. on August 20th.

Alice's version of the August 20, 2007, meeting is slightly different from Zhao's.  Alice asserts that Zhao called her on August 20, 2007, while she was in the middle of a telephone conversation with her parents.  Alice claims she called Zhao back after she finished the

conversation with her parents, and told Zhao that she was between a rock and a hard place because she didn't have enough money to cover her motel room.  Zhao offered to meet Alice at her motel and help in any way that he could.  Alice's telephone records do not show an incoming call from either of Zhao's two telephone numbers recited by Merena.  However, Alice testified  that Zhao had more than two telephone numbers.

Zhao testified that he left his job, drove to Salt Lake and met Alice sometime between 5:30 and 6:00 p.m. in the lobby of the motel where Alice was staying.  Zhao stated that he and Alice talked for about 2 or 3 hours, and recalls leaving his visit sometime around 9:00 p.m.[1] When Zhao asked Alice to explain what was going on, Alice told Zhao that when she returned home from a visit to Montana, she entered her home and heard noises that lead her to believe that Merena was home having sex with another person.  Notwithstanding the allegations of infidelity, Zhao pled with Alice to reconcile with Merena.  Zhao concedes that Alice did not promise to reconcile with Merena.  However, Zhao was nevertheless hopeful because Alice was "crying and sobbing" during their meeting, which led Zhao to believe that Alice genuinely cared for Merena.  Alice also wanted Zhao to keep an eye on Merena because Alice thought Merena was severely depressed and might be suicidal.

During their August 20, 2007, visit, Alice told Zhao that she had no money to pay her motel bill.  Alice's father had apparently been in Utah prior to August 20, 2007, and had paid for Alice's motel bill with his credit card.  However, when Alice's father left Utah and returned to Montana, the motel would not allow Alice to use her father's credit card without her father's

---

[1]  Zhao's testimony about the time of the meeting is interesting because Alice's phone records show that she placed a call to Zhao at 6.55 p.m.

written authorization.  This development put Alice in a panic because all her belongings were still in the motel room, to which she was denied access.

Zhao testified that Alice's emotional state and concern for Merena lead Zhao to believe that some hope still existed for a reconciliation between Alice and Merena.  Zhao's hope of a reconciliation compelled Zhao to pay for Alice's motel room.  Zhao considered his payment of Alice's motel bill a gift and has not sought repayment of that amount.

Alice was also terribly worried about her children on August 20, 2007, and wanted to return to Montana in order to think things through.  Alice claims that Zhao proceeded to extract a wad of one hundred dollar bills from his pocket and "peel" off seven, giving them to Alice.  Zhao told Alice at that time that she would need money for food and she would need money for gas to get back to Montana.  Alice told Zhao at that time that she would repay the $700.00.  Zhao replied that Alice should repay the money when she could.

Zhao now claims that Alice misled him when she said she had no money on August 20, 2007.  In fact, Zhao contends that he has since learned that Alice was making quite a bit of money in August of 2007 and that she in fact had money in her bank account on August 20, 2007.  Zhao also later learned that Alice had signed a Petition for Divorce on August 20, 2007, which Petition for Divorce was filed on August 21, 2007, with the Third Judicial District Court in and for Salt Lake County, State of Utah.  Zhao was adamant that he would not have loaned Alice the $700.00 if he would have known that she was planning on divorcing Merena.

Although not at the August 20, 2007, meeting between Zhao and Alice, Merena testified that he is "intimately" familiar with Zhao's and Alice's August 20, 2007, meeting.  Zhao testified he talked to Merena after the August 20, 2007, meeting and told Merena where Alice

7

was staying.  Merena contends, however, that he spoke with Zhao prior to the meeting and told Zhao that "no wife of mine will be indigent, I won't have that" and then told Zhao to "loan her some money if you have to, but make sure she is taken care of."  Whether Merena spoke to Zhao prior to or after the meeting is not particularly relevant.  However, the testimony is troubling because despite the pending cohabitant abuse proceeding and despite Alice's request for a protective order, Merena was obviously very interested in Alice's whereabouts and Zhao apparently had no qualms about disclosing Alice's whereabouts to Merena.

Zhao and Alice met once again on September 8, 2007, in the parking lot of Nordstrom's. Unbeknownst to Alice, Zhao taped his September 8, 2007, conversation with Alice and shared the contents of the taped conversation with Merena.  Zhao claims that the taped conversation proves that Alice intended to repay the $700.00 to Zhao.  Neither an audio nor written transcript of the September 8, 2007, recording was offered into evidence, but Alice does not dispute that Zhao gave her $700.00 or that she intended to repay such amount.

Moreover, neither party disputes that Alice now owes Zhao $800.00 as a result of a small claims judgment that he obtained with respect to the $700.00 he loaned Alice on August 20, 2007.  On October 16, 2007, Zhao, with the help of Merena, filed a small claims action against Alice seeking repayment of the $700.00 along with $95.00 in fees and costs.  Alice did not respond to Zhao's small claims complaint and on November 27, 2007, the Fourth District Court, State of Utah, Provo Small Claims Department issued a Small Claims Judgment against Alice and in favor of Zhao in the amount of $700.00 plus an additional $100.00 in fees and costs, for a total judgment of $800.00, together with interest at 6.99 percent per year.

8

In January of 2008, Merena, acting as Zhao's attorney,[2] obtained a Writ of Execution with respect to Zhao's $800.00 small claims judgment, had Alice's 2003 Honda Civic seized in Montana on or about January 17, 2008, and had the Writ recorded as a foreign judgment in Montana on April 10, 2008.[3]  Alice filed her bankruptcy petition on January 30, 2008, and the 2003 Honda Civic was returned to Alice either on February 18 or 19, 2008.  Because Zhao was not able to satisfy his judgment, Zhao filed a Proof of Claim asserting, as of Alice's petition date, an unsecured claim of $4,372.16, which amount stems from Zhao's November 27, 2007, $800.00 small claims judgment.[4]

Shortly after Zhao filed his small claims complaint on October 16, 2007, Merena, individually and doing business as Merena Investments, filed a complaint against Alice on October 22, 207, in the Third Judicial District Court, Salt Lake County, State of Utah, asserting claims of slander, libel and interference with economic relations.  Merena claims in the District Court action that Alice's statements of infidelity against Merena were willful and malicious and

---

[2]  Apparently Merena acted as and was compensated to serve as Zhao's attorney in the small claims action.  However, no evidence exists in the record to show that Merena is an attorney.

[3]  Curiously, the foreign judgment was recorded in Montana well after Alice's bankruptcy petition date and neither Merena nor Zhao obtained relief from the automatic stay to seek collection of Zhao's prepetition judgment.

[4]  Based upon the evidence produced at trial, it appears that Zhao's Proof of Claim is grossly overstated.  Zhao, with the assistance of Merena, represented himself in the action against Alice, yet Zhao claims he incurred attorneys fees of $350.00 prior to Alice's petition date.  It also appears that Zhao is billing Alice twice for service of the Writ, storage of Alice's Honda, towing of Alice's Honda, delivery of papers and additional service of various papers.  Moreover, the storage and towing fees incurred by Zhao are arguably void because Zhao failed to domesticate his judgment in Montana until after Alice's petition date.  It also appears that Zhao's interest calculation is grossly overstated because accrued interest of 6.99% on the $800.00 judgment between November 27, 2007, and January 30, 2008, is only $9.81.

his damages from such libelous statements should be excepted from discharge under 11 U.S.C.

§ 523(a)(6).  The Plaintiffs' § 523(a)(6) claim was dismissed by separate Order and Judgment

as Plaintiffs at the trial on December 16, 2008, informed the Court that they would not

introduce any evidence on the 11 U.S.C. §523(a)(6) issue.  Interestingly, Merena claims that he

was precluded from presenting any evidence on that Count because the Court would not allow

him to tardily identify witnesses.  In an Affidavit dated March 21, 2008, and filed in Alice's

main bankruptcy case on March 22, 2008, Merena claimed, with respect to his libel and slander

action, that the "three most important witnesses that I am aware of at this point in time are

myself, Yu Zhao and Pete Daniels. . . .  I believe it is essential to my case for Yu Zhao and Pete

Daniels to testify on my behalf at trial."  Even though Merena felt that Pete Daniels was an

essential witness on March 21, 2008, he failed to identify him as a witness in the Final Pretrial

Order filed December 9, 2008, and instead did not identify him as a witness until December 10,

2008, when Merena filed his motion to supplement witness list, which motion was denied by

the Court.

### **Alice's Financial Condition on August 20, 2007**.

Exhibit 6 shows that Alice was working for George S. May International Company in

August of 2007.  As of August 25, 2007, Alice had earned gross pay totaling $6,600.80 year-to-

date.  As of December 22, 2007, Alice had earned gross wages in 2007 totaling $14,659.89.

Alice started working for George S. May International Company in July of 2007 and for the pay

period immediately preceding her August 20, 2007, meeting with Zhao, Alice earned gross pay

of $0.00, but received a mileage and sundry reimbursement of $117.50.  In an email dated

December 11, 2007, Alice requested a leave of absence from her job at George S. May

International Company.  Alice explained that she needed the leave of absence to get her life back in order.

Exhibit 10 shows that Alice's bank account at U.S. Bank had a balance of $363.25 on August 17, 2007.  Exhibit 10 also reflects that Alice made withdrawals and purchases of $483.43 less a return of $53.41 between August 15, 2007, and August 18, 2007.  Three purchases made on August 15, 2007, and one purchase made August 16, 2007, were posted to Alice's bank account on August 17, 2007.  The remaining withdrawals, purchases and return were posted to Alice's bank account August 20, 2007.[5]  Considering the above transactions, Alice's account should have reflected a negative balance of $66.77 as of August 19, 2007.  However, as noted above, the majority of discussed transactions did not post to Alice's account until August 20, 2007, and at some point in time on August 20, 2007, Alice made a deposit of $1,498.61 into her account.  Alice testified, however, that the funds she deposited on August 20, 2007, were not available for immediate use on August 20, 2007, other than to presumably cover her negative account balance.

Exhibit 8, a copy of billing invoices from Alice's divorce counsel in Utah, also show that Alice's Utah counsel was paid $1,500.00 on August 20, 2007.  However, Alice explained that she did not make the $1,500.00 payment to the attorney, but rather, Alice's parents made such payment.

### Alice's Bankruptcy Filing.

Merena, on behalf of Zhao, had Alice's Honda Civic seized on or about January 17, 2008.  The Honda Civic was Alice's sole means of transportation for her and her two minor

---

[5]  August 18th and 19th were and Saturday and Sunday, respectively.

children.  As of January 17, 2008, Alice was on a leave of absence from her job at George S. May International Company,[6] no longer had a car to drive, and Alice and her two children were living with Alice's elderly grandmother.  Moreover, Alice was faced with mounting legal bills stemming from her divorce proceeding, Merena's pending libel and slander action, the pending cohabitant abuse charges against Merena and a request for a custody evaluation filed, at Merena's prompting, by Alice's former spouse.

In an effort to regain possession of her Honda Civic and to have a reprieve from her legal battles, Alice filed an emergency voluntary Chapter 13 bankruptcy petition on January 30, 2008.  Alice filed her original Schedules and Statement of Financial Affairs ("SOFA") on February 26, 2008, listing the total value of all her assets as $10,121.58.

In her SOFA filed February 26, 2008, Alice disclosed Merena's pending libel and slander lawsuit and also disclosed Zhao's small claims action.  Alice, however, failed to disclose the three other court proceedings, namely, her pending divorce proceeding,[7] her

---

[6]  In a letter dated February 6, 2008, a divisional sales manager of George S. May International Company acknowledged and accepted Alice's resignation.  Alice's email of December 11, 2007, requested only a leave of absence.  It is not clear from the record how Alice's request for a leave of absence became a resignation, but Alice did testify at trial that someone at George S. May International Company had told her that if she did not have a car, she also did not have a job.  Merena had Alice's Honda repossessed on January 17, 2008, which may have been a contributing factor to Alice's resignation because Alice was essentially a traveling sales person.  Alice's amended Schedule I filed December 11, 2008, reflects that Alice began working as an administrative assistant for her bankruptcy counsel sometime in mid July of 2008.  As of December 11, 2008, Alice's monthly net income and child support from Ryan Gravely totaled $2,082.36.

[7]  Merena has filed a counterclaim against Alice in the divorce proceeding seeking alimony, a division of marital debt and a requirement that Alice secure an insurance policy to cover any amounts she may owe to Merena and to cover her share of the marital debt in the event of her demise.

pending cohabitant abuse proceeding against Merena and the pending custody proceeding.[8]

Alice similarly failed to disclose the payments that were made by Alice's parents to Alice's Utah divorce attorney.[9]  In particular, Exhibit 8 shows that as of January 30, 2008, Alice had a credit balance of $4,454.93 with Morrison & Morrison, L.C.  The credit balance was not disclosed on either the SOFA or Alice's schedules.  As for her schedules, Alice failed to list a Roth IRA worth $379.18, a 19" television, a laptop computer and an iPod on Schedule B.[10]

In an objection to confirmation filed March 20, 2008, the Chapter 13 Trustee argued that Alice's Chapter 13 plan was not feasible, that Alice did not have regular income and that Alice had "omitted transfers including a transfer to her Utah attorney, who is holding a retainer paid to him in the Debtor's divorce case."  Neither the Plaintiffs nor Alice mentioned how the Chapter 13 Trustee learned of the money paid to Alice's Utah attorneys but the Court presumes that these facts were disclosed by Alice to the Chapter 13 Trustee during the 341 Meeting of Creditors.

Because Alice was unemployed in March of 2008, Alice clearly had no means of funding a Chapter 13 plan.[11]  Therefore, Alice subsequently filed a motion to convert her

---

[8]  The Plaintiffs also pointed out that Alice incorrectly listed Zhao's small claims action under questions 4(a) rather than 4(b) on her SOFA.

[9]  In addition to the payment of $1,500.00 made on August 20, 2007, Alice paid her divorce counsel, Morrison & Morrison, L.C., an additional $5,000.00 on November 8, 2007.

[10]  Alice did list a computer on her original Schedule B, but it is not clear whether the computer was a desktop computer or a laptop computer.

[11]  Alice's elderly grandmother was self-sufficient when Alice and her children first moved in with Alice's grandmother.  However, Alice's grandmother went downhill and Alice eventually ended up caring for her grandmother until Alice's grandmother's eventual death.

bankruptcy to one under Chapter 7 on April 11, 2008.  Alice's Motion was granted and a Chapter 7 341 Meeting of Creditors was held May 27, 2008.  Joseph Womack, the Chapter 7 Trustee in Alice's bankruptcy, testified that Alice informed him at her 341 Meeting of Creditors about the omitted items discussed above and later amended her Schedules and SOFA on December 11, 2008, to include the omitted items of property (all of which were claimed as exempt on Alice's amended Schedule C), and to include the omitted lawsuits.

Alice explained at trial that she simply misunderstood question 4 of the SOFA because she thought she only needed to list pending suits that might have some type of financial impact on Alice's finances or her bankruptcy proceeding.  As for the omitted assets, Alice testified that the laptop computer did not work, the 19" television was given to Alice's children by Alice's mother after her petition date, and that Alice simply overlooked the ipod because she was using the categories on the schedules to bring to mind all her belongings.  Alice also overlooked the Roth IRA, explaining that she had not made a contribution to the IRA since before she and Merena were married and that she had not been receiving her quarterly statements because Merena had Alice's mail rerouted to him.

The value of Alice's assets in the amended schedules total $4,630.76.  Alice also amended her Schedule F on December 11, 2008, to reflect a $1,500.00 obligation owed to Oculoplastic Surgery which she inadvertently left out of her original schedules.

Although Alice did not have possession of her Honda Civic on her petition date, Alice listed a "2003 Honda Civic 4D" on her original Schedule B as having a value of $6,000.00.[12]

_____

[12]  Alice was able to secure possession of her Honda from Merena and Zhao sometime around February 18 or 19, 2008.

Alice did not list any liens against the Honda Civic. Merena insists that Alice incorrectly listed her Honda as a DX model rather than a LX model in her schedules. The Court could not find anywhere in the record where Alice listed her Honda as a DX. However, even if Alice had listed the Honda as a DX, that fact would have been rendered moot when Merena made a point of telling the Trustee that Alice's Honda was an LX and not a DX. Armed with Merena's information, the Chapter 7 Trustee testified that he personally inspected Alice's Honda Civic and took pictures of both the interior and exterior of the car. Based upon his personal inspection of the Honda, which the Trustee recalled had in excess of 100,000 miles, and based upon the Trustee's independent review of NADA and Kelly Blue Book, the Trustee determined that Alice's estimated value of $6,000.00 was reasonable.

Following the Chapter 7 341 Meeting of Creditors, Alice entered into an agreement with the Trustee to purchase her Honda Civic for $6,000.00. Upon learning of the proposed sale, Merena offered to purchase Alice's Honda Civic for $8,500.00, which amount was greater than the amount Alice had agreed to pay. Alice could not afford to match Merena's offer of $8,500.00. Accordingly, Alice surrendered her Honda Civic to the Chapter 7 Trustee on or about July 20, 2008, and the Honda was sold to Merena.

As just stated, Merena purchased Alice's Honda and claims he is "intimately" familiar with the vehicle. Merena contends he compared the value asserted by Alice with the NADA and Kelly Blue Book values and determined that the value of the car was far in excess of the value claimed by Alice. Merena testified that with 113,000 miles, Alice's car booked out at

15

$10,390.00.[13]  During examination by his counsel, who was inquiring about Exhibit 28, Merena informed the Court that while he did not have Exhibit 28 in front of him, if counsel could describe Exhibit 28, Merena had "total recall."  Counsel referred Merena to the NADA and Kelly Blue Book values emailed by Merena to counsel.

Exhibit 28 shows that the NADA trade-in value for a clean 2003 Honda Civic was $7,000.00 and that clean retail value was $8,775.  The value of $10,390 on Exhibit 28 is the suggested retail value of an undisclosed vehicle with 113,000 miles in "excellent" condition. Exhibit 28 notes, under a description of "excellent," that "less than 5% of all used vehicles fall into this category."  The Court must reject Merena's asserted valuation of $10,390.00 because no evidence exists in the record showing that Alice's Honda fell into the 5% of cars considered in excellent condition.  More importantly, however, is the fact that Exhibit 28 fails to link the $10,390.00 Kelly Blue Book valuation to an identified vehicle.

Merena claims he bought Alice's Honda from the Trustee because Alice promised to buy him a new car when she graduated from college.  Merena was driving a 1999 Mercedes Compressor that had 145,000 miles and was killing him in repairs.  Merena thus bought Alice's Honda for $8,500.00 and drove it for a period of time.  Merena claims the $8,500.00 was a bargain at the time because he sold the Honda for $8,900.00, perhaps 6 or 7 weeks prior to the December 16, 2008, hearing.[14]  Merena could not recall who bought the Honda, because he had no need to know the man's name, but testified that he sold it to a gentleman who was

---

[13]  Merena insisted that Alice's Honda had 113,000 miles when he purchased it, but the Trustee recalls that Alice's Honda had 113,000 to 120,000 miles.

[14]  While Merena could not remember the date he sold the Honda, he informed the Court a couple sentences later in his testimony that he was pretty good with dates.

purchasing the car for his college daughter.[15]  Merena let the man and daughter duo take the

Honda for a day and the man returned and gave Merena $1,000.00 cash and a cashier's check

for the remaining balance of $7,900.00.  When pressed for details about the sale by Alice's

counsel, Merena replied that the only proof of the sale was his "good word."

   According to the Trustee's testimony, the only item of concern to the Chapter 7 Trustee

in Alice's bankruptcy was the credit balance that Alice had with Morrison & Morrison, L.C. on

her petition date.  As previously noted, Alice testified that the monies paid to her Utah attorney

came from her parents.  The Trustee testified that he will further investigate the retainer to

make sure that those funds were indeed paid by Alice's parents, and not Alice.  While the

Trustee agreed with Plaintiffs' counsel that Alice's original schedules and SOFA were not

complete and accurate, the Trustee specifically testified that it is not uncommon for debtors to

forget various assets on their schedules and that debtors generally add the omitted assets by

subsequent amendment such as Alice did.  Similarly, the Trustee stated that debtors frequently

forget to schedule all their debt.  The Trustee agreed with Plaintiffs' counsel that Alice should

have disclosed the omitted lawsuits, but the Trustee also noted that Alice amended her SOFA to

reflect the lawsuits.[16]  The Trustee also noted that the omitted lawsuits were not overly

important in this case because they did not involve claims belonging to the estate.  Other than

Alice's credit balance with Morrison & Morrison, L.C., which Alice did not attempt to conceal

---

[15]  Merena, however, easily recalled the name of the man who repossessed Alice's Honda
for Merena.

[16]  The Trustee also testified that Alice stated under oath that she expected to get nothing
from her divorce from Merena, other than the personal items that are now in her possession.
However, the testimony shows that Merena is seeking alimony from Alice and also some type of
insurance policy in favor of Merena in case of Alice's demise.

17

from the Trustee, the Trustee saw nothing of concern in Alice's schedules and stated that he had no reason to bring a motion to dismiss for abuse and no reasons existed in his opinion for him to seek denial of Alice's discharge.

Unlike the Trustee, Merena took issue with everything imaginably possible in Alice's bankruptcy. In addition to the matters discussed above, Merena testified that he bought snow skis for Alice. Alice listed two pairs of skis on both her original Schedule B and her amended Schedule B. Alice lists the value of the two pair of skis as $250.00. Merena implied at trial that Alice had understated the value of the skis, but offered no other valuation for the skis, other than Alice's $250.00 value. Merena also testified that he bought Alice a leather jacket. Alice testified that the leather jacket is lumped under the clothing category on both Alice's Schedule B and amended Schedule B.

Merena's counsel also tried to show that Alice failed to list her interest in her former husband's pension fund. The merit of Merena's argument failed when Alice testified that she received a portion of her former husband's pension fund pursuant to a Qualified Domestic Relations Order entered March 1, 2004. Alice's share of the pension fund was not listed on Schedule B because Alice cashed in her share of the pension fund in 2004 and reported such event on her 2004 income tax return.

The Plaintiffs then turned their focus to Alice's Form 22C, Schedule I and Statement of Monthly Net Income. The Plaintiffs took issue with the fact that Alice listed $2,983.65 as her average monthly income on the Statement of Monthly Net Income, which amount the Plaintiffs argued did not reconcile with Alice's gross income of $1,800.00 disclosed on Schedule I or Alice's monthly income of $2,718.00 as reported on line 11 of Form 22C. Alice explained that

18

the net income figures listed on the Statement of Monthly Net Income were based upon her payment advices and income from other sources (child support) for the months of July through December of 2007.  Alice requested a leave of absence from her job on December 11, 2007, to be effective December 18th or 19th.  Although Exhibit 25 would suggest that Alice did not work after December 18 or 19, 2007, Alice claims she worked a little in January of 2008, earning $1,800.00.  The $1,800.00 is what Alice showed as her monthly gross income on Schedule I, with the further clarification on Schedule I that the "income stated in this schedule is imputed based upon Debtor's former job in Utah; she is currently seeking employment and has job prospects."  As for Form 22C, Alice used her January gross income of $1,800.00 rather than her average gross income.  While Alice's Form 22C is technically incorrect, the inaccuracy does not materially impact this case because Alice's annualized current monthly income is still well-below Montana's applicable median family income for a family of three living in Montana.

The Plaintiffs next argued that Alice's discharge should be denied because Alice failed to disclose the sale of her condominium.  Alice sold her condominium in Sandy, Utah for $145,000.00 in June of 2006.  Alice received $23,723.03 in proceeds from the sale, which proceeds were deposited into Alice's account on June 23, 2006.  Alice used about one-half of the proceeds for living expenses.  Alice used another portion of the proceeds to repay her parents the $10,000.00 they previously loaned her for the down payment of the condominium. The $10,000.00 was paid to Alice's parents on or about September 25, 2006.  While the Trustee was aware of the sale of Alice's condominium, Alice did not list the sale in her SOFA.

Next, when Alice completed the Request for Protective Order, she indicated that neither she nor Merena had ever been involved in any other court case involving Alice, Merena or their

19

respective children.  Exhibit 15 shows that Alice was charged with domestic violence in the presence of a child and criminal mischief on January 13, 2006.  Those charges stemmed from an altercation between Merena and Alice.  Exhibit 15, however, also shows that the aforesaid charges against Alice were ultimately dismissed.

The Plaintiffs then attacked the $10,400.00 obligation listed by Alice on Schedule F as owing to her mother, Marlene Davis.  The Court is not quite sure where the Plaintiffs were going with this point, but Exhibit 12 shows that Marlene Davis gave Alice a check for $500.00 on or about August 27, 2007, and another check for $2,500.00 on or about October 15, 2007.  Exhibit G then shows that Marlene Davis also wrote Alice a check for $100.00 on August 13, 2007, a check for $5,200.00 on November 6, 2007, and another check for $250.00 on November 20, 2007.  Alice also claims that her parents paid for part of her attorney bills with a credit card and paid for prescriptions and other similar items.  While the above amounts may or may not add up to $10,400.00, Alice and her mother, Marlene Davis, executed a Promissory Note dated November 6, 2007, wherein Alice agreed to pay her mother the sum of $10,400.00, without interest, within ten years of November 6, 2007.  Exhibit F.

Merena continued that Alice's discharge should be denied because she failed to produce various requested documents.  Alice testified that many of her financial records were destroyed when the basement of her 98-year-old grandmother's house flooded.  Alice was thus forced to request new records from her former employer and from her bank.

Not to be deterred, Merena then claims that Alice took various items of his property when she moved out of the marital home.  Specifically, Merena argues that Alice took a garage door opener, a GPS unit (Merena bought the GPS unit because according to him "Alice had a

hard time with directions"), a bunk bed set, a 25" color television (which Merena asserts is incorrectly listed in Alice's schedules as a 27" television), an electric inflatable mattress and pictures of Alice.

Merena claims he purchased a "cumbersome" bunk bed set in 2005 and said bed was used by his daughter.  During direct examination and when pressed by Alice's counsel, Merena testified as follows:

| | |
|---|---|
| COUNSEL: | In your earlier testimony, you made reference to our daughter[.] In truth, [she] is not your daughter is she? |
| MERENA: | I always considered her my daughter.  And that's why I refer to her as such. |
| COUNSEL: | Mr. Merena, she's not your daughter is she? |
| MERENA: | Yes she is. |
| COUNSEL: | Is she your biological daughter? |
| MERENA: | No she's not. |

Merena testified that he was terribly upset to learn that Alice had taken the bunk bed because it had both sentimental and intrinsic value, stating, "that is where our children slept.  And that's where my son came home to discover that it was gone and he cried over it."

The foregoing facts provide the foundation for the legal disputes now before the Court. The Court finds as follows on the Plaintiffs' various claims.

## Zhao's Claim under 11 U.S.C. § 523(a)(2)(A).

It is well-settled that the Bankruptcy Code's central purpose is to provide a "fresh start" to the "honest but unfortunate debtor."  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007); *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654,

112 L.Ed.2d 755 (1991). The "fresh start" is explained by the Ninth Circuit Bankruptcy

Appellate Panel in *Albarran v. New Form, Inc. (In re Albarran)*, 347 B.R. 369, 379 (9th Cir.

BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to discharge debts and to make a fresh start free from the burden of past indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but honest, there is a presumption that all debts are dischargeable unless a party who contends otherwise proves, with competent evidence, an exception to discharge. *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p. 870 (2006 ed.).

> The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan v. Garner*, in further explaining the "fresh start" policy of the Bankruptcy Code,

states that "a central purpose of the Code is to provide a procedure by which certain insolvent

debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity

in life with a clear field for future effort, unhampered by the pressure and discouragement of

preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230

(1934)." 498 U.S. 279, 286, 111 S.Ct. 654, 659 112 L.Ed.2d 755 (1991). However, under

certain circumstances, a creditor may seek to except from a debtor's discharge certain debts.

*See* 11 U.S.C. §§ 523(a). Nevertheless, consistent with effectuating the underlying purposes of

the Bankruptcy Code, exceptions to discharge under § 523 are narrowly construed. *See Snoke*

*v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992). Notwithstanding the weighty burden,

a creditor, in order to prevail, need only establish the elements of nondischargeability under 11

U.S.C. § 523, by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 287-88.

To establish nondischargeability as a result of fraud under § 523(a)(2)(A)[17], courts in the Ninth Circuit employ the following five-part test:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;
> (2) knowledge of the falsity or deceptiveness of his statement or conduct;
> (3) an intent to deceive;
> (4) justifiable reliance by the creditor on the debtor's statement or conduct; and
> (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001); *Turtle Rock Meadows Homeowners Assoc. v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000); *American Express Travel Related Services Co. Inc. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996). The determination of nondischargeability under § 523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A) mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the RESTATEMENT (SECOND) OF TORTS (1976) §§ 525-557A. *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443-44, 133 L.Ed.2d 351 (1995) ("'false pretenses, a false representation, or actual fraud,'. . . are common-law terms, and...in the case of 'actual fraud,'...they imply elements that the common law has defined them to include.").

---

[17]  11 U.S.C. § 523(a)(2)(A) reads:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–

* * *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

1.  Intent to Deceive

The first three elements of § 523(a)(2)(A), when taken together, establish the element of intent to deceive, which the creditor must establish by a preponderance of the evidence.  In other words, a creditor, in a three-party transaction, must establish that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor. Since direct proof of intent to deceive is nearly impossible to obtain, the element of intent may be inferred from proof of surrounding circumstances  "if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor." *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir. 1996) (allowing courts to infer the existence of intent in the context of credit card fraud, a three-party transaction).  However, in a two-party transaction, such as the case *sub judice* a creditor must "prove the elements of misrepresentation and reliance directly and by a preponderance of evidence."  "We decline to apply the totality of circumstances test to two-party transactions."  *Slyman*, 234 F.3d at 1086. Consequently, implied representations that would be considered in three-party transactions will not be considered in two-party transactions, such as the transaction between Alice and Zhao. Zhao must directly prove the elements of misrepresentation and reliance.

As to the remaining elements, a creditor sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of a particular case, answers the following two inquiries in the affirmative: 1) did the creditor justifiably rely on the debtor's representation–reliance; and 2) was the debt sought to be discharged proximately caused by the first two elements–causation.

24

### 2. Reliance

A creditor must establish that it relied on the false representations made by the debtor. *Field*, 116 S.Ct at 438 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id*. As the Supreme Court held in *Field*, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id*. at 444 (quoting § 540 RESTATEMENT (SECOND) OF TORTS (1976)). This standard depends upon the knowledge and experience of the person to whom the representations were made. As the Supreme Court in *Field* further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id*. (quoting § 541, Comment a., RESTATEMENT (SECOND) OF TORTS (1976)). Interpreting this standard, the Ninth Circuit Court of Appeals teaches: "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud." *Apte*, 96 F.3d at 1322.

### 3. Causation

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with the intent to deceive. *Britton v. Price (In re Britton)*, 950

25

F.2d 602, 604 (9th Cir. 1991). "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id*. at 604. Moreover, as the United States Supreme Court explained in *Field*, a court may turn to the RESTATEMENT (SECOND) OF TORTS, "the most widely accepted distillation of the common law of torts" for guidance on this issue. *Field*, 116 S.Ct. at 443.

The RESTATEMENT (SECOND) OF TORTS (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss, § 546; and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result from the reliance." § 548A. *See also Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 220 (1st Cir. BAP 2002). In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. (In re Siriani)*, 967 F.2d 302, 306 (9th Cir. 1992).

As discussed above, the Plaintiffs must first show that Alice had an intent to deceive Zhao during their August 20, 2007, meeting. The Plaintiffs' evidence on this point is two-fold. They contend that Alice represented that she had no money, when in fact she did, and that Alice failed to tell Zhao that she had signed divorce papers earlier that day.

First, the Court concludes that Alice's statement that she had no money on August 20, 2007, was accurate. At the start of the day on August 20, 2007, Alice's bank account technically had a negative balance of $66.77. Alice admitted at trial that she deposited $1,498.61 into her account at some point in time on August 20, 2007. Alice then continued to

26

explain that the funds of $1,498.61 that she deposited on August 20, 2007, were not available for withdrawal until sometime after August 20, 2007.  The Plaintiffs did not dispute this critical fact.

Alice testified that she was in a panic because the motel was denying Alice access to her room, where her belongings were still located, until she paid her motel bill.  Both Zhao and Alice testified that they met in the lobby of Alice's motel, which is consistent with Alice's testimony that she did not have access to her room.  In addition, Zhao's testimony that Alice was very emotional during their meeting is consistent with Alice's testimony that she was in a panic.

In addition to the fact that Alice deposited $1,498.61 into her bank account on August 20, 2007, Zhao claims that Alice obviously had money on August 20, 2007, because she paid her divorce attorney $1,500.00 on that date.  Alice testified that the $1,500.00 payment to Morrison & Morrison was paid by her parents.  Alice's testimony is corroborated by Alice's bank statement, which does not reflect any payment to Morrison & Morrison of $1,500.00. Additionally, any payment made to Morrison & Morrison was presumably made during normal business hours.  Alice did not meet with Zhao until 5:30 or 6:00 p.m.  Thus, even if Alice did make the payment of $1,500.00 to Morrison & Morrison on August 20, 2007, she no longer had those funds by the time she met with Zhao.  In sum, the Plaintiffs have failed to show that Alice had funds in her bank account to which she had immediate access at the time she met with Zhao on August 20, 2007.

The second part of the Plaintiffs' argument on this element is that Alice misled Zhao when she showed concern for Merena's well-being, but then failed to tell Zhao that she had

signed divorce papers earlier in the day.  Zhao testified that he attended a hearing earlier that day with Merena on Alice's Request for Protective Order.  Alice specifically states in the Request for Protective Order that "she is ending the relationship [with Merena] and seeking a Divorce and fears [Merena's] reaction."  Based upon Alice's statement in the Request for Protective Order made on August 14, 2007, Zhao either knew or should have known that Alice was contemplating divorce.

The Plaintiffs' gloss over Alice's statement in the Request for Protective Order made six days prior to the August 20, 2007, meeting and instead make the crabbed argument that Alice's genuine concern for Merena's well-being on August 20, 2007, should be construed as a statement or conduct that was made with intent to deceive.  Zhao admits that Alice never once agreed to reconcile with Merena on August 20, 2007.  The fact that Alice showed genuine concern for Merena is not in dispute and she probably was truly concerned for his well-being, particularly if he was suicidal.  However, the Court cannot fashion intent to deceive out of someone's genuine concern combined with Zhao's admission that Alice never once agreed to reconcile with Merena.  The Plaintiffs have simply failed to carry their burden of proof by showing that Alice intended to deceive Zhao on August 20, 2007, and thus, they have failed their burden under 11 U.S.C. § 523(a)(2)(A).

The Court would normally end its inquiry at this juncture.  However, even if the Plaintiffs were successful in showing that Alice intended to deceive Zhao on August 20, 2007, the Plaintiffs have not shown that Zhao justifiably relied on Alice's statements or conduct.  As noted above, Alice made a statement six days prior to her meeting with Zhao that she was going to divorce Merena.  Given Zhao's relationship with Merena and given the fact that Zhao had

28

attended the protective order hearing, Zhao knew that Alice intended on divorcing Merena. That stated intent combined with Alice's refusal to tell Zhao that she would reconcile with Merena should have alerted Zhao that Alice was going to proceed with the divorce. Thus, this Court is precluded from finding that Zhao's reliance was justifiable. Alice's failure to inform Zhao that she had signed her divorce papers prior to their meeting can easily be attributed to Zhao's physical size, his indisputably close relationship with Merena and Alice's fear of future violence on the part of Merena. Consequently, the Plaintiffs fail with their claim under 11 U.S.C. § 523(a)(2)(A) and such Count of the Plaintiffs' Complaint is dismissed with prejudice.

### Plaintiffs' Claim under 11 U.S.C. § 523(a)(6).

At the commencement of the trial on December 16, 2008, counsel for the Plaintiffs informed the Court that the Plaintiffs would not offer any proof on Count I of their Complaint. The Order setting the trial date in this case was entered on August 20, 2008, and in that Order, the Court directed that "[o]n or before December 9, 2008, each party shall file with the Court and serve upon opposing counsel or parties: (a) a list identifying by name and address all prospective witnesses, including specifying all expert witnesses; and (b) a list of all proposed exhibits[.]" Pursuant to the scheduling order, the parties filed a Final Pretrial Order on December 9, 2008, wherein the Plaintiffs identified their witnesses as Kenneth Merena, Yu Zhao, Alice Merena, Marlene Davis and Erwin James Davis. On December 9, 2008, the Plaintiffs also filed a motion seeking a one day extension of time within which to file their exhibits. In an Order entered that same date, the Court approved Plaintiffs' request and granted all parties through December 10, 2008, to file their exhibits.

Subsequently, on December 10, 2008, Plaintiffs filed a motion seeking to supplement

29

their witness list with an additional 32 witnesses, some of who were vaguely identified as "Mike (Last name unknown)", "Classmates at George May (name unknown)" and "Cousin in Anchorage, Alaska (name unknown)."  After determining that the Court's general Rule on exhibits found at Mont. LBR 5074-1(b) had been superseded by the more specific provision of the scheduling order entered August 20, 2008, which directed that witness lists be filed no later than December 9, 2008, the Court, in an Order entered December 11, 2008, denied Plaintiffs' request to supplement their witness list, reasoning that while "[d]eadlines may lead to unwelcome results, but they prompt parties to act and they produce finality."  *Taylor v. Freeland & Kronz*, 503 U.S. 638, 644, 112 S.Ct. 1644, 1648, 118 L.Ed.2d 280 (1992).  The Plaintiffs did not appeal the Court's December 11, 2008, ruling but instead appeared at the trial and stated that they would not offer any proof on their willful and malicious injury claim 11 U.S.C. § 523(a)(6), Count I, because the Court had denied the Plaintiffs' request to supplement their witness list.  Following conclusion of the Plaintiffs' case-in-chief on December 16, 2008, the Defendant requested a directed verdict on Count I.  In an Order and Judgment entered December 17, 2008, the Court granted Alice's request for a directed verdict and dismissed Count I of the Plaintiffs' Complaint with prejudice.  The Plaintiffs appealed the Court's dismissal of Count I on December 24, 2008.  Only Counts II, III and IV of the Complaint remain.

### Plaintiffs' Claims under 11 U.S.C. § 727.

"A claim for denial of discharge under § 727 is construed liberally and in favor of the discharge and strictly against a person objecting to the discharge."  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re*

*Adeeb*), 787 F.2d 1339, 1342 (9ᵗʰ Cir. 1986).  The purpose of the liberal construction of § 727 is, like the liberal construction of § 523(a), to protect the honest, but unfortunate debtor. Consistent therewith, the party seeking to deny the debtor's discharge bears the burden of proof, which under § 727 is a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. at 289; *Searles v. Riley (In re Searles)*, 317 B.R. 368, 376 (9ᵗʰ Cir. BAP 2004), *aff'd.*, 212 Fed.Appx. 589 (9ᵗʰ Cir. 2006).

At this juncture, the Court notes and deems it significant that the Trustee in Alice's Chapter 7 case, Joseph V. Womack, appeared and testified that he saw nothing out-of-the-ordinary in this case that would warrant a proceeding to deny Alice's discharge.  Furthermore, the Court concludes and finds, after observing Merena's demeanor while testifying under oath and cross examination, and upon examination of the exhibits, that Merena is not a credible witness.  *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9ᵗʰ Cir. 2002); *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518  (1985); *In re Taylor*, 514 F.2d 1370, 1373-74 (9ᵗʰ Cir. 1975).

**11 U.S.C. § 727(a)(4).**

Neither the Plaintiffs' Complaint nor the Final Pretrial Order identify under which subsection of § 727(a)(4) the Plaintiffs seek to deny Alice's discharge. However, the Plaintiffs' Pretrial Brief filed December 12, 2008, addresses only § 727(a)(4)(A).[18]  Although the Plaintiffs are not specific on their claim, this Court finds that only § 727(a)(4)(A) could apply to this case. This Court construed § 727(a)(4)(A) in *Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R. 149,

---

[18]  The Plaintiffs' Pretrial Brief is silent with respect to their claims under 11 U.S.C. §§727(a)(6) and 727(a)(3).

31

150-51, 17 Mont. B.R. 43, 44-46 (Bankr. D. Mont. 1999):

> The Bankruptcy Code provides that a debtor under Chapter 7 shall be granted a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case--(A) made a false oath or account...."  11 U.S.C. S 727(a)(4).  Thus, to succeed on a § 727(a)(4)(A) claim, the objecting party must demonstrate that:  (1) a false oath or statement was made by the debtor; (2) knowingly and fraudulently; (3) which was material to the course of the bankruptcy proceedings.  *First Nat'l Bank of Crosby v. Syrtveit (In re Syrtveit)*, 105 B.R. 596 (Bankr. Mont. 1989).  A false oath or statement is made when it occurs (1) in the debtor's schedules or (2) at an examination during the course of the proceedings.  *Scimeca v. Umanoff*, 169 B.R. 536, 542 (D.N.J.1993);  *aff'd*, 30 F.3d 1488 (3d Cir.1994).  The Court in *Scimeca* noted that while the initial burden lies on the objector to prove that the debtor made a false statement in connection with the proceedings, once it "reasonably appears the oath is false, the burden falls on the bankrupt" to disprove the allegation.  *Scimeca*, 169 B.R. at 542; *Kramer v. Poland (In re Poland)*, 222 B.R. 374 (Bankr. M.D.Fla 1998) ("it is well established that once the Plaintiff has met the initial burden by producing evidence which establishes a basis for the objection, the Defendant has the ultimate burden of persuasion.  *See, Chalik v. Morrefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).").

* * * *

With regard to materiality, the Eighth Circuit Court of Appeals adopted the following standard of materiality as espoused by the Eleventh Circuit Court of Appeals in *Chalik*, 916 F.2d at 484:

> The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.

*Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992). . . .  This case highlights an obvious and fundamental maxim in bankruptcy–that providing false information under oath in a bankruptcy proceeding is not a matter to be taken lightly.  *See e.g., Tully*, 818 F.2d 106, 112 (1st Cir. 1987) (stressing that sworn statements in bankruptcy schedules "must be regarded as serious business" because "the system will collapse if debtors are not forthcoming");  *In re Nazarian*, 18 B.R. 143, 146 (Bankr. D.Md.1982) (noting that a creditor need not actually rely on the false statement).  As previously noted by this Court,

> The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the

bankruptcy estate so they can rely upon it without the need for the
Trustee or other interested parties to dig out the true facts through
examinations or investigations.

*Bastrom*, 106 B.R. at 227.

*See also Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65, 76 (Bankr. N.D. Tex. 2000).

This Court discussed a debtor's responsibility in completing schedules and statements

of financial affairs in *Torgenrud v. Wolcott (In re Wolcott)*, 194 B.R. 477, 486 (Bankr. D. Mont.

1996):

> As to the false declarations in Wolcott's Schedules and Statement of Affairs,
> the preparation and filing of such documents for the Bankruptcy Court "is no idle
> task." *Torgenrud v. Smith (In re Smith )*, 14 Mont.B.R. 228, 232 (Bankr. D.
> Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent
> omission of property from sworn schedules [which] amounts to an offense
> punishable by the Criminal Code.' " *In re Woodson*, 839 F.2d 610, 614 (9th
> Cir.1988). "Numerous cases hold that the debtor has a duty to prepare schedules
> carefully, completely and accurately." *In re Mohring*, 142 B.R. 389, 394
> (Bankr.E.D.Cal.1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*,
> 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed
> with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has
> "no discretion in this regard." *Smith*, 14 Mont.B.R. at 233. Furthermore, a debtor
> has an affirmative duty to "cooperate with the trustee in preparing a 'complete
> inventory of the property of the debtor.' " *Mohring*, 142 B.R. at 394. Failure to
> follow these precepts results in denial of a debtor's general discharge for harboring
> an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at 753-754.
>
> In the case *sub judice*, Wolcott's actions fly in the face of the foregoing
> dictates. The Court identified at least six flat falsehoods contained in Wolcott's
> Schedules and Statements of Affairs. Furthermore, in written arguments filed with
> the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset.
> These flagrant violations of Wolcott's clear duty of honesty and forthrightness in
> the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to
> conceal property. Thus, once again, even construing the evidence against Wolcott in
> the most lenient light, the Court finds 11 U.S.C. § 727(a)(2) altogether satisfied.

The above-quoted language demonstrates the overlap between the subsections of § 727, and

was included in this Court's decision in *Wright*, 364 B.R. at 71-73 and *Abbey v. Retz (In re*

*Retz)*, Adversary Proceeding No. 05-00018 (Bankr. D. Mont. Sept. 6, 2007).

All that is required for a denial of discharge under the plain language of § 727(a)(4)(A) is a single false oath or account. *Wright*, 364 B.R. at 73; *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 277 (1st Cir. BAP 1999) (*citing Schmitz*). "A false oath may involve a false statement or omission in the debtor's schedules." *Wills*, 243 B.R. at 62; *Searles*, 317 B.R. at 377, citing *Wills*; *Wright*, 364 B.R. at 73.

Materiality may be established if a false statement "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property". *In re Retz*, 364 B.R. 742, 758-59 (Bankr. D. Mont. 2007) (denying summary judgment), quoting *Wills*, 243 B.R. at 62. The above analysis in *Schmitz* remains good law consistent with the BAP's analysis of §727(a)(4) in *Searles* and *Wills*, 243 B.R. at 62-63, in which the BAP sets forth a comprehensive analysis of intent and materiality as thus:

> Materiality is broadly defined.   A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.  *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984).   See also *In re Weiner*, 208 B.R. 69, 72 (9th Cir. BAP 1997), rev'd on other grounds, 161 F.3d 1216 (9th Cir.1998) (citing *Chalik* and holding that a false statement is material if it "bears a relationship to the debtor's estate, and concerns the discovery of assets, or the existence and disposition of his property").
>
> A false statement or omission may be material even if it does not cause direct financial prejudice to creditors.   See *Weiner*, 208 B.R. at 72; *Chalik*, 748 F.2d at 618.  *See also In re Hoblitzell*, 223 B.R. 211, 215-16 (Bankr.E.D.Cal.1998) (omission of asset may be material even if it did not financially prejudice the estate or creditors "if it aids in understanding the debtor's financial affairs and transactions"); [*In re Ford*, 159 B.R. 590, 593 (Bankr. D. Or. 1993)] (omission or false statement may be material if it is relevant to the discovery of past transactions--value of omitted assets does not have to be significant to be material

and no detriment to creditors need be shown); *In re Haverland*, 150 B.R. 768, 771 (Bankr.S.D.Cal.1993) (applying standard set forth in *Chalik* and noting that materiality of false oath does not depend on whether the falsehood is detrimental to creditors).

The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations.  [*In re Aubrey*, 111 B.R. 268, 274 (9th Cir. BAP 1990)].  "[T]he opportunity to obtain a fresh start is . . . conditioned upon truthful disclosure."  *Id.* "The entire thrust of an objection to discharge because of a false oath or account is to prevent knowing fraud or perjury in the bankruptcy case.  As a result, the objection should not apply to minor errors or deviations in testimony under oath." William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRACTICE 2D § 74.11 (1997).   A false statement or omission that has no impact on a bankruptcy case is not grounds for denial of a discharge under § 727(a)(4)(A).  6 Lawrence P. King *et al.*, COLLIER ON BANKRUPTCY ¶ 727.04[1][b] (15th ed. Rev. 1998)(citing *In re Fischer*, 4 B.R. 517 (Bankr.S.D.Fla.1980)).  As a result, omissions or misstatements relating to assets having little or no value may be considered immaterial.  *See, e.g., In re Waddle*, 29 B.R. 100 (Bankr. W.D. Ky. 1983). Likewise, omissions or misstatements concerning property that would not be property of the estate may not meet the materiality requirement of § 727(a)(4)(A).  *See, e.g., In re Swanson*, 36 B.R. 99 (9th Cir. BAP 1984). However, an omission or misstatement relating to an asset that is of little value or that would not be property of the estate is material if the omission or misstatement detrimentally affects administration of the estate.

> In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors. Even if the debtor can show that the assets were of little value or that a full and truthful answer would not have directly increased the estate assets, a discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition. Similarly, if the omission interferes with the possibility of a preference or fraudulent conveyance action the omission may be considered material.

6 King, COLLIER ON BANKRUPTCY ¶ 727.04[1][b].

In this case, the bankruptcy court determined that the false statements and omissions in Debtors' petition were not material solely because Fogal did not show that the assets had sufficient value to increase the amount paid to creditors. Based on the above authorities, we conclude that a statement or omission relating

to an asset that is of little value or that would not be property of the estate can be
material if it detrimentally affects the administration of the estate.   The
bankruptcy court applied an incorrect interpretation of the materiality requirement
of § 727(a)(4)(A).   We therefore remand so that the court can apply the correct
legal standard.

 b. Intent

To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that
the debtor knowingly and fraudulently made a false oath. *Aubrey*, 111 B.R. at 274.
Intent must be actual, not constructive.  *In re Devers*, 759 F.2d 751, 753 (9th
Cir.1985).

*See Wright*, 364 B.R. at 73-74.

As noted above debtors must knowingly and fraudulently make a false oath.  First, the

Court considers the term "fraudulently."  The requisite fraudulent intent "must be actual, not

constructive".  *Wills* 243 B.R. at 64 (citing *Devers*, 759 F.2d at 753).  The Plaintiffs may prove

such intent through "circumstantial evidence or by inferences drawn from Alice's course of

conduct." *Id*. (citing *Devers*, 759 F.2d at 753-54).  Surrounding circumstances and certain

badges of fraud may establish the necessary intent.  *Wills*, 243 B.R. at 64, citing *See In re

Woodfield,* 978 F.2d 516, 518-19 (9th Cir.1992).  Although *Woodfield* involves 11 U.S.C. §

727(a)(2), the analysis of intent applicable to such section applies also to 11 U.S.C. § 727(a)(4).

6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.).  "A court may find the requisite

intent where there has been a pattern of falsity or from a debtor's reckless indifference to or

disregard of the truth."  *Wills*, 243 B.R. at 64 (citing *Garcia v. Coombs (In re Coombs)*, 193

B.R. 557, 564 (Bankr. S.D.Cal. 1996)).

The second term "knowingly" requires that Alice acted deliberately and consciously.

*Roberts*, 331 B.R. at 883.  The following analysis from *Roberts*, is instructive:

> The bankruptcy court did not make a finding that Roberts acted deliberately and consciously in failing to make these disclosures until he amended his Statement. Instead, the court found that Roberts exhibited, "a careless and reckless approach to the important duty of disclosure in sworn bankruptcy filings." "Careless and reckless" is a lower standard than "knowing."
>
> An action is careless if it is "engaged in without reasonable care." *Id.* at 225. This is a negligence standard, not a knowing misconduct standard. A false statement resulting from ignorance or carelessness does not rise to the level of "knowing and fraudulent." *See, e.g., Mondore v. Mondore (In re Mondore),* 326 B.R. 214, 217 (Bankr.W.D.N.Y.2005) ("a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent").
>
> Similarly, recklessness does not measure up to the statutory requirement of "knowing" misconduct. An action is reckless if it creates, "a substantial and unjustifiable risk of harm to others [through] a conscious (and sometimes deliberate) disregard for or indifference to that risk ...." BLACK'S LAW DICTIONARY at 1298. Since the bankruptcy court did not find that Roberts made his nondisclosures "knowingly" in the required sense, we cannot sustain the denial of his discharge.

*Roberts*, 331 B.R. at 884.  The Court notes however that "[a] reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge."  *Wright*, 364 B.R. at 76, quoting 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.).  The elements of "knowingly" and "fraudulently" may not be conflated.  They each must be proven.  *See Roberts,* 331 B.R. at 885.

A debtor's bankruptcy schedules must be verified or contain an unsworn declaration under penalty of perjury.  28 U.S.C. § 1746; F.R.B.P. Rule 1008; *Searles*, 317 B.R. at 377.  Accordingly, a false statement or omission in a debtor's schedules or statement of financial affairs qualifies as a false oath under § 727(a)(4)(A).  *In re Leija*, 270 B.R. 497, 502-03 (Bankr. E.D. Cal. 2001).  Alice testified at trial that she signed the declarations under penalty of perjury,

and that she read her Schedules and SOFA.  What the evidence shows is that while Alice read her Schedules and SOFA, she still inadvertently failed to list a couple minor assets on Schedule B and out of ignorance of the Bankruptcy Code, failed to disclose three pending lawsuits and the prior sale of her condominium.

A  common instance of 'false oath' is when a debtor declares that the schedule of property is true and correct and it appears that the debtor has knowingly and fraudulently omitted assets from it.  But if items were omitted by mistake, the declaration will not be deemed willfully false, and the discharge should not be denied because of it.  *Wright*, 364 B.R. at 76; 6 COLLIER ON BANKRUPTCY, ¶ 727.04[2] (15th ed. rev.) (citing *In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) ("explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud").  *Adeeb* noted that a debtor's reliance on attorney advice must be in good faith.  787 F.2d at 1343.  An omission by mistake is exactly what exits in this case.

In an attempt to cast Alice's mistake in an unfavorable light, the Plaintiffs argue that Alice's failure to promptly amend should be construed as a fraudulent act.  In the Ninth Circuit the fact of *prompt* correction of an inaccuracy or omission may be evidence probative of lack of fraudulent intent.  *Searles*, 317 B.R. at 377 (emphasis added), citing *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 733 (9th Cir. BAP 1999), *aff'd.*, 5 Fed.Appx 743 (9th Cir. 2001).  The BAP in *Beauchamp* surveyed cases including *Adeeb* and *Baker v. Mereshian*, 200 B.R. 342, 346 (9th Cir. BAP 1996).  *Id.,* 236 B.R. at 733.  The BAP first noted that "*Mereshian* does not stand for the proposition that § 341 meeting confessions absolve fraud", and then observed that "None of them holds that disclosure of secreted assets at or before the § 341 meeting precludes finding

38

intent to hinder, delay or defraud, and we will not extend *Adeeb*[19] so far." *Beauchamp*, 236 B.R. at 733, 734.  Alice disclosed many of the items missing from her Schedules and SOFA to the Trustee at the § 341(a) meeting and while Alice did not amend promptly, the Court sees no evidence of fraudulent intent as explained in *Searles* and *Beauchamp.*  317 B.R. at 377.

In summation, the Court finds that the Plaintiffs failed their burden of proof by a preponderance of the evidence by failing to show knowing and fraudulent false oaths and omissions in Alice's Schedules and SOFA.  *See Wright*, 364 B.R. at 72-73, quoting *Schmitz*, 224 B.R. at 150-51 and *Wolcott*, 194 B.R. at 486 (citing cases).  In particular, the Plaintiffs have not shown fraudulent intent through a pattern of falsity, reckless indifference to and disregard of the truth, and demonstrated course of conduct.  *Wills*, 243 B.R. at 64; *Devers*, 759 F.2d at 753-54; *Wright*, 364 B.R. at 75.

Moreover, in addition to failing to prove that Alice's omissions and errors on her Schedules and SOFA were done knowingly and with fraudulent intent, the Plaintiffs failed to show that such omissions were material.  The Trustee testified that the omitted assets had little value and had no impact on the bankruptcy case.  Similarly, the omitted lawsuits bear no relationship to Alice's bankruptcy estate and do not concern business dealings or the existence and disposition of Alice's property.  Accordingly, the Plaintiffs' request for denial of Alice's discharge under 11 U.S.C. § 723(a)(4) fails.

_____

[19]*Adeeb* involved a § 727(a)(2)(A) claim in which the Ninth Circuit concluded "that a debtor who transfers property within one year of bankruptcy with the intent penalized by section 727(a)(2)(A) may not be denied discharge of his debts if he reveals the transfers to his creditors, recovers substantially all of the property before he files his bankruptcy, and is otherwise qualified for a discharge."  787 F.2d at 1345.  The Ninth Circuit specified that a concealment may be undone simply by disclosing the existence of the property, but disclosure does not undo a transfer – a transfer may be undone by recovering the property.  *Id.*

**11 U.S.C. § 727(a)(3)(A).**

Section 727(a)(3) provides that the court shall grant the debtor a discharge, unless – "(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, and papers, from which the debtor's financial condition of business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case."  The Plaintiffs have the burden of proof under § 727(a)(3) which is strictly construed against the party objecting to discharge.  *Wright*, 364 B.R. at 68.

The Ninth Circuit explained in *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994):

> "[t]he purpose of [section 727] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Cox*, 904 F.2d at 1401 (internal quotations and citations omitted). The initial burden of proof under § 727(a)(3) is on the plaintiff. Fed.R.Bank.P. 4005. "In order to state a prima facie case under section 727(a)(3), a creditor objecting to discharge must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir.1992). Once the objecting party shows that the debtor's records are absent or are inadequate, the burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of the records. *Id.* at 1233; *Cox*, 904 F.2d at 1404 n. 5; *Matter of Horton*, 621 F.2d 968, 972 (9th Cir.1980); *In re Lawler*, 141 B.R. 425, 428-29 (9th Cir. BAP 1992) (stating that a debtor must "provide a credible explanation" for failure to keep records); see also *In re Wolfson*, 152 B.R. 830, 832 (S.D.N.Y.1993); *In re Folger*, 149 B.R. 183, 188 (D.Kan.1992); *In re Pulos*, 168 B.R. 682, 690 (Bankr.D.Minn.1994); *In re Sausser*, 159 B.R. 352, 355-56 (Bankr.M.D.Fla.1993).

*Cox*, 41 F.3d at 1296-97; *Wright*, 364 B.R. at 68.  Intent to conceal is not a necessary element for the denial of discharge under § 727(a)(3).  *Cox*, 41 F.3d at 1297.

The Plaintiffs argue that they requested documents from Alice and that Alice failed to

promptly turnover the requested documents.  First, the Plaintiffs fail to identify the documents that they requested and which were not turned over by Alice.  Second, as for Alice's delay in producing certain records, such as wage and bank statements, Alice explained that a flood at her grandmother's house destroyed many of Alice's records and she had to request copies from her bank and employer.  Alice showed at trial that she produced those records which she had in her possession or control in a manner reasonable under the circumstances.  In addition to failing to identify any particular missing documents, the Court does not see where the Plaintiffs moved for discovery sanctions against Alice.

In *Wright* the Court discussed the case, *Matter of Juzwiak*, 89 F.3d 424, 429 (7th Cir. 1996), in which the creditor offered the testimony of two expert accountants who testified, after reviewing the debtor's records, and concluded that the debtor's records were incomplete compared with what similar clients kept.  *Wright*, 364 B.R. at 51.  The Plaintiffs did not offer any qualified expert accountant or other witness regarding what it found in Alice's records, and offered no expert testimony by qualified experts upon which the Court could make a finding that Alice's records were not adequate or specifying what documents and records would be considered adequate.  Given the Plaintiffs' burden of proof and strict construction of § 727(a) against the objecting party, *Roberts*, 331 B.R. at 882, any inference by the Court regarding the adequacy of Alice's books and records, in the absence of qualified testimony, would be inappropriate and inconsistent with the assigned burden of proof.  *Wright*, 364 B.R. at 69.

What the record does show in this case is that the Plaintiffs had virtually every document imaginable, including bank records, employment records and telephone records covering several months along with legal documents from the various proceedings and the closing documents

41

from Alice's sale of her condominium.  The Court is hard-pressed to imagine any documents that are missing from the record.  Moreover, the Trustee did not join in the Plaintiffs' § 727(a)(3) objection to discharge, and testified that other than perhaps some additional documentation from Alice's parents, no additional documents were needed beyond those which Alice has already produced.  Based on the records produced at trial and the Plaintiffs' failure to offer testimony by an expert as offered in *Juzwiak*, the Court concludes that the Plaintiffs failed to satisfy the first *Cox* requirement that Alice failed to maintain and preserve adequate business records.  Given that failure, it is not necessary to consider the second *Cox* factor – whether it is impossible to ascertain Alice's financial condition and material business transactions, and the burden of proof does not shift to Alice.  *Wright*, 364 B.R. at 70; *Cox*, 41 F.3d at 1296.

**11 U.S.C. § 727(a)(6)(C).**

Section 727(a)(6)(C) provides that the court shall grant the debtor a discharge, unless – "(3) the debtor has refused in the case . . . (C) on a ground other than the properly invoked privilege against self-incrimination, to respond to a material question approved by the court or to testify[.]"  On this issue, the parties provide in their Final Pretrial Order that the Court "must determine (1) that certain questions were requested of the debtor when asked to testify, (2) that the statements were incomplete and did not include all knowledge of the debtor on that matter, [and] (3) that the questions were of a material import in the proceedings."

This Court is not aware of any question which it approved that was not answered by Alice.  The Plaintiffs contend that Alice refused to answer one or some of their questions during a 2004 examination, but refusal to answer questions at a Rule 2004 examination ordered by this Court is not a refusal to answer a question ordered by the Court.  *See Gore v. Kressner (In re*

42

*Kressner)*, 206 B.R. 303 (S.D.N.Y. 1997), *aff'd* 152 F.3d 919 (2nd Cir. 1998).  As explained

further in 6 COLLIER ON BANKRUPTCY, ¶ 727.09[3]:

> Section 727(a)(6)(C) denies a discharge to a debtor who refuses to respond to a material question approved by the court or refuses to testify on any ground other than the properly invoked privilege against self-incrimination.  This section applies when the debtor refuses to answer a "material question approved by the court."

> "Court" means a judge, and not simply a trustee, United States trustee or other official.  The debtor's refusal to answer a question that has not been approved by the court is not a basis for denial of a discharge.  Thus, a refusal to answer questions in a creditors' meeting or a deposition is not grounds for denial of a discharge if, when the court subsequently approved the question, the debtor answers it.  If court approval is never sought, the debtor is not required to answer the question.

The Plaintiffs never sought Court approval of a question.  Thus, any claim that Alice

refused to answer a question at a 2004 examination or at some other time simply fails to give

rise to a claim under 11 U.S.C. § 727(a)(6)(C).

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

1334 and 157.

2.  This is a core proceeding involving the Plaintiffs' objections to discharge under 28

U.S.C. § 157(b)(2)(J) and 11 U.S.C. §§ 523(a)(2)(A), 523(a)(6), 727(a)(3), 727(a)(4) and

727(a)(6)(C),  which are construed liberally and in favor of the discharge and strictly against the

party objecting to discharge.  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir.

BAP 2005); *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).

3.  The Plaintiffs failed to satisfy their burden of proof by a preponderance of the

evidence with respect to their claims to except their individual debts from discharge under 11

U.S.C. §§ 523(a)(2)(A) and 523(a)(6).

4.   The Plaintiffs failed to satisfy their burden of proof by a preponderance of the evidence with respect to their claims to deny Alice's discharge under 11 U.S.C. §§ 727(a)(3), 727(a)(4) and 727(a)(6)(C).  Accordingly

IT IS ORDERED that the Court will enter a separate Judgment in favor of the Debtor/Defendant, Alice Michelle Merena, and against the Plaintiffs, Kenneth Merena and Yu Zhao; and the Plaintiffs' Complaint seeking to except debts from discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6), or in the alternative, to deny Alice's discharge under 11 U.S.C. §§ 727(a)(3), 727(a)(4) and 727(a)(6)(C), is DISMISSED with prejudice.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana